```
┌─────────────────────────────────┐
│ USDS SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED: 11/23/09            │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA

08 CR. 1220 (PKC)

        -against-

MEMORANDUM AND ORDER

JOHN A. GOTTI,
  a/k/a "John, Jr.,"
  a/k/a "Junior,"

           Defendant.
-----------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.:

        Jury deliberations have been underway since November 11, 2009 in the trial of

a three-count superseding indictment alleging membership in a RICO conspiracy and two

counts of murder while engaged in a drug trafficking conspiracy.

        On November 20, Jerry Capeci, a self-described "news reporter who has been

writing a weekly column about organized crime called 'Gang Land,'" addressed a letter to the

Court titled "Pro Se Motion to Obtain Photocopies of Jury Notes." The motion seeks

"photocopies" of juror notes. (Motion at 1.) During deliberations, the Court has read into the

record the content of substantive juror notes, and, as an accommodation to the press, made

retyped versions available. The motion unambiguously seeks the "handwriting that the

juror[s] used while writing the note[s]." (Motion at 2 (arguing that typed versions of letters

made available to the press by the Court are "an unsatisfactory substitute for seeing the actual

words, with whatever capital letters, misspellings, underlinings, punctuation marks and

handwriting that the juror used while writing the note.")) During the course of this trial, I

have received similar requests from other members of the press.

2

For the reasons explained below, the motion is denied.

I. BACKGROUND

In the Superseding Indictment, the defendant is alleged, among other things, to have been a member of a RICO conspiracy, and one of the crimes alleged to be part of the pattern of racketeering activity is jury tampering. (Superseding Indictment ¶¶ 17(m), 20.) In this case, I concluded that a fair trial would be best achieved by a jury that is reasonably secure and insulated from outside influences, which would be promoted by shielding juror identities. On July 20, 2009, well before jury selection began, I ordered that jurors' names, addresses and places of employment be kept confidential and not disclosed to any person. See Local Criminal Rule 23.1(h). (Docket #71.) I also directed that jurors follow the directions of the United States Marshal Service concerning the time, place and manner of their keeping; and that the United States Marshal Service make appropriate arrangements for the transport of jurors at the direction of the Court. The Order concluded, among other things, that such measures were necessary to mitigate the risk of improper juror contact.

Prior to individual questioning, all prospective jurors in this case completed a written questionnaire 20 pages in length. Among other things, the questionnaire identified the defendant in this case, gave background on the charges brought against the defendant, and listed the individuals and locations expected to be relevant to the case. Approximately 407 prospective jurors completed the questionnaire. The questionnaires identified jurors only by number and requested that jurors not disclose identifying information such as name, the

3

names of family members, home addresses or places of employment. In instances in which responses inadvertently disclosed identifying details, the Court redacted those responses prior to forwarding the completed questionnaires to counsel.

Following review by counsel and the Court, jurors who were not excused for cause or substantial hardship on the basis of their responses to the questionnaire were questioned in open court during the week of September 14, 2009, in the presence of counsel. Members of the press requested and were granted the right to stand at the sidebar during questioning of venire members. See generally ABC, Inc. v. Martha Stewart, 360 F.3d 90 (2d Cir. 2004).

Certain tabloid newspapers have covered the trial closely. For example, prior to venire persons arriving to Court, a daily newspaper obtained copies of the juror questionnaires from counsel and quoted in a published story responses of individual venire members. ("Prospective jurors don't want any part of Junior Gotti's upcoming trial," by Alison Gendar, New York Daily News, Sept. 10, 2009.) A subsequent New York Daily News article by Ms. Gendar and Larry McShane, dated September 17, 2009, was accompanied by a visual graphic with background details on 12 anonymous jurors, setting forth details of their race, sex, education and profession.

Following statements made to the press by one of the defendant's attorneys, the Court issued an order under the authority of Local Criminal Rule 23.1(c) & (d)(4) and (7) concerning "whether special procedures ought to be implemented during the trial of this

4

action to ensure a fair trial by an impartial jury and to insulate the jury from any extra-judicial statements and other matters which might interfere with their ability to render a fair and impartial verdict." (Docket # 139.) The Order, dated September 18, 2009, noted, inter alia, that "the jury has been instructed not to read anything about the case" but that "there remains a danger of inadvertent exposure." The Order enjoined counsel, as well as their agents, servants, employees and other persons in active concert or participation with them, from violating Local Criminal Rule 23.1.

In the course of trial, individual jurors have from time to time sent notes to the Court concerning purely administrative matters. These administrative concerns include scheduling, climate control, lunch options, proper juror attire and notifications to employers as to individual jury service. Such notes are marked as court exhibits, reviewed by the Court and counsel, and, upon request, often made available to members of the press. In instances in which jurors have requested the Court to write letters addressed to jurors' employers concerning jury service, the Court has included in the employer letters the caption and docket number of this case. Any identifying information as to the notes' authors is redacted by the Court prior to their disclosure to the parties and the public.

From time to time, juror communications to the Court on purely administrative matters have become the subject of published press accounts. Certain published news articles have included identifying details about the jurors, specifically the following:

5

- The precise amount of one juror's monthly child-support obligations as well as the age of the juror's child. ("For jurors, a case of the jitters?" by John Riley and Anthony M. Destefano, Newsday, Sept. 22, 2009.)
- A published report on a juror's "reaction" to a flu shot, her doctor's diagnosis of a sinus infection and her financial concerns about jury service. ("'Jr.' juror thought she was out, but judge pulls her back in," by Bruce Golding, New York Post, Sept. 24, 2009.)
- Quotation from a juror's note to the Court stating that "[t]he food and menus here are the same, and the jurors are getting tired of it." ("'Junior' juror's a goner," by Bruce Golding, New York Post, Oct. 20, 2009.)
- A report identifying the specific restaurant, Spaghetti Western, as the location of the anonymous jury's lunch. ("'Junior' jurors lapping it up," by Bruce Golding and Amber Sutherland, New York Post, Oct. 23, 2009.) A fair assumption is that a reporter trailed the jurors and Deputy Marshals from the courthouse to the restaurant.[1]
- Numerous reports on an anonymous letter addressed to the Court purporting to set forth juror interactions, including the letter writer's negative impressions of a particular juror. ("Nightmare Gotti juror's foul disruptions," by Bruce Golding, New York Post, Oct. 27, 2009; "'Diva' juror at Gotti trial," by Bruce Golding, New York Post, Oct. 28, 2009; "Infighting Among Junior Gotti jurors as anonymous snitch reveals chaos," by Alison Gendar and Larry McShane, New York Daily News, Oct. 28, 2009; "Complaint from the jury box," by John Riley, Newsday, Oct. 28, 2009.) The letter's full text was photographically reproduced in The New York Post. ("'Diva' juror at Gotti trial," by Bruce Golding, New York Post, Oct. 28, 2009.) The New York Post also made a PDF version of the letter available for download from its website.
- Published observations concerning the interactions between jurors during cigarette breaks. ("Sweet twists in Gotti trial," by Bruce Golding, New York Post, Nov. 4, 2009.)

---

[1] The article falsely stated that I had joined the jury on its lunch outing, stating: "One juror even gave Manhattan federal Judge Kevin Castel a thumbs-up at the Spaghetti Western eatery on Reade Street." Intentional judicial contact with jurors during the course of trial and outside the presence of counsel would not have been appropriate.

6

## II.  DISCUSSION

### A.  Legal Standard

The public may gain access to documents filed with the court if they are judicial documents subject to the common law right of public access to judicial documents or the qualified First Amendment right to access judicial documents.  Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006).  These rights apply only if "the documents at issue are indeed 'judicial documents.'"  Id. at 119.  A document does not become a judicial document merely because it is filed with a court.  United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) (Amodeo I).  Rather, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document."  Id.

#### i.  Common Law Right of Public Access

Under the common law right of public access, if a document is in fact a judicial document, a "presumption favoring access" attaches.  Id. at 146.  The strength of this presumption, however, depends upon the nature of the document:

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.  Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) (Amodeo II).

A strong presumption of public access derives "from the role those documents

7

play[] in determining litigants' substantive rights—conduct at the heart of Article III—and

from the need for public monitoring of that conduct." Id. For documents that fall in the

middle of the continuum, "the weight to be accorded to the presumption of access must be

determined by the exercise of judgment." Id. at 1049-50.  Finally, documents that "play only

a negligible role in the performance of Article III duties" are entitled to a low presumption

that "amounts to little more than a prediction of public access absent a countervailing

reason." Id. at 1050.

Once the court has determined the strength of the presumption, the court must

balance this against countervailing factors such as "the danger of impairing . . . judicial

efficiency" and "the privacy interest of those resisting disclosure." Id.  In performing this

analysis, "[t]he privacy interests of innocent third parties . . . should weigh heavily in a

court's balancing equation." Id. (quotation and citations omitted, alteration in original).

In determining the weight accorded an assertion of privacy, the court should

"consider the degree to which the subject matter is traditionally considered private rather than

public." Id. at 1051.  The court should also consider how the party seeking the documents

will use the information. Id.  "Courts have long declined to allow public access simply to

cater 'to a morbid craving for that which is sensational and impure.'" Id. (quoting In re

Caswell, 29 A. 259, 259 (R.I. 1893)).

8

### ii. Qualified First Amendment Right of Access

The Second Circuit has set forth two approaches for determining whether the First Amendment grants the public and press a right of access to judicial documents. The "experience and logic" approach "requires the court to consider both whether the documents 'have historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" <u>Lugosch</u>, 435 F.3d at 120 (quoting <u>Press-Enterprise Co. v. Superior Court</u>, 478 U.S. 1, 8 (1986)). "The second approach considers the extent to which the judicial documents are 'derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings.'" <u>Id.</u> (quoting <u>Hartford Courant Co. v. Pellegrino</u>, 380 F.3d 92, 93 (2d Cir. 2004)) (alteration in original). As with the common law right of public access, if the court determines that the qualified First Amendment right applies to certain documents, the court may nevertheless seal documents "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." <u>In re New York Times Co.</u>, 828 F.2d 110, 116 (2d Cir. 1987) (quotations and citation omitted).

### B. The November 20, 2009 Motion is Denied.

### i. Administrative Notes

The overwhelming majority of notes that I have received from this jury, as discussed above, relate to purely administrative matters, such as issues of scheduling, climate control, dining options and letters to employers or prospective employers. As is proper, these

9

notes were marked as court exhibits and reviewed by the Court and counsel. Many times, upon request from a member of the press, I have produced typed reproductions of the notes. The typed reproductions have been drafted to precisely mimic the text of the original handwritten notes and do not alter the text in any aspect, including any spelling errors or anomalies in punctuation, textual emphasis (e.g., underlining) or grammar.

These administrative notes, however, are not judicial documents. They do not relate to the performance of my judicial function and are not useful in the judicial process. Thus, these administrative notes do not fall within the purview of the common law right of public access or the qualified First Amendment right of access, and I decline to produce photographic copies of administrative notes bearing the jurors' handwriting.

ii.  Non-Administrative Notes

In contrast to the purely administrative notes, other notes have fallen within the category of judicial documents. These notes are of relevance to my performance of the judicial function and are useful in the judicial process. See Amodeo I, 44 F.3d at 145.

For example, Court's Exhibit number 90 asks: "How are John Gotti's acts, as stipulated by the prosecution, with respect to Angelo Noviello, a violation of the first count?" Court's Exhibit number 106 states: "Regarding Counts 2 + 3, if the jury cannot agree unanimously that the gov't has met its burden on the first element, (i.e. that there was a conspiracy), does the jury need to consider any of the last 3 elements of counts 2 + 3 (as indicated on page 93 of instructions) or should each juror consider independently all 4

10

elements?" Thus, I must analyze whether these and similar juror notes that are substantive in
nature are subject to either the common law right to public access or to the qualified First
Amendment right of access.

      a.   Common Law Right to Public Access

      I conclude that the content of these notes relates to the performance of a
judicial function and the presumption of access applies to them. I further conclude that the
presumption is reasonably strong as to the content of those notes that seek guidance from the
Court on a matter of substance. In this case, I draw a sharp distinction between the content of
a note and the handwriting of its author. The handwriting has no bearing upon the Court's
exercise of its judicial function. The actual handwritten notes are preserved and are shown to
counsel, but the actual handwriting is immaterial to any action by the Court. If I am wrong
and the presumption of access applies to the entirety of the notes including handwriting, then
I would conclude that the same considerations that warranted an anonymous jury weigh
against and overcome the presumption of access.

      An individual's handwriting is unique and can be used to identify that person.
Gilbert v. California, 388 U.S. 263, 266-67 (1967) ("A mere handwriting exemplar, in
contrast to the content of what is written, like the voice or body itself, is an identifying
physical characteristic . . . ."); cf. Fed. R. Evid. 901(b)(2) (stating that a "[n]onexpert opinion
as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the
litigation" satisfies the requirement of authentication or identification). At least one daily

11

newspaper has elected to publish a photographic reproduction of the typed October 25, 2009 letter addressed to the Court and purporting to be from a juror. ("'Diva' juror at Gotti trial," by Bruce Golding, New York Post, Oct. 28, 2009.)[2]

If, like the typed October 25 letter, actual juror notes were photographically reproduced in a newspaper or posted on a website, it increases the chance that one or more jurors would be identified from their handwriting. Publication of an anonymous juror's personal handwriting could make the identity of the juror apparent to anyone familiar with that person's handwriting, whether a relative, friend or co-worker. The identification of a juror on a high-profile case would increase the risk that a non-juror would contact the juror and attempt to discuss the case. This would be true, even assuming, as I do, that jurors have refrained from reading news reports about the case.

As noted, the indictment in this case contains allegations of past acts of jury tampering. (Supra, at 1-2.) Witnesses at this trial have testified that alleged co-conspirators have attempted to learn the identities of anonymous jurors in other cases. The Court and the parties have a strong interest in maintaining the anonymity of the jurors to ensure the integrity of the judicial process, the defendant's right to a fair trial and to guard against a potential mistrial. The jurors have a strong privacy interest in maintaining anonymity. These interests overcome the presumption of public access accorded to the substantive notes. I will continue

---

[2] Prior to the published, photographic reproduction of the October 25 letter, I had made photocopies of original juror notes, both administrative and substantive, available for review by members of the press, with identifying details redacted. Subsequent to publication of the October 25 letter, I have provided to the press only the retyped text of the notes, again redacting any identifying information.

12

to read substantive notes into the trial record and make retyped versions available to the press. Handwriting exemplars of jurors are off limits.

### b. Qualified First Amendment Right to Public Access

Turning to the First Amendment, I need not employ the "experience and logic" approach or determine whether the handwritten non-administrative notes are derived from or are a necessary corollary of the capacity to attend the trial. In all events, withholding photocopies that contain the jurors' handwriting is essential to preserving the values discussed above. Given the high level of press interest in the conduct of individual jurors, there is a serious risk that juror anonymity would be compromised by publication of juror handwriting. Providing the press with typed reproductions is a remedy that is narrowly tailored to serve the press's interest in disclosure while preserving juror anonymity. When requested, typed copies of juror notes on substantive matters have been provided promptly to members of the press. The typed version of the notes' text provides the press and members of the public with the substance of the jurors' substantive notes, including misspellings, punctuation marks and capitalization, without providing them with identifying handwriting exemplars.

The motion is DENIED.

13

SO ORDERED.

P. Kevin Castel
United States District Judge

New York, New York
November 23, 2009